J-S10010-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LOYD WAITMAN GROVES | : | |
| | : | |
| Appellant | : | No. 291 MDA 2019 |

Appeal from the Judgment of Sentence Entered January 17, 2019
In the Court of Common Pleas of Clinton County
Criminal Division at No(s):  CP-18-CR-0000173-2015

BEFORE:  PANELLA, P.J., KUNSELMAN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY PANELLA, P.J.:

Loyd Waitman Groves appeals from the judgment of sentence entered on January 17, 2019 in the Clinton County Court of Common Pleas. On December 3, 2018, a jury convicted Groves of third-degree murder in the death of Katherine Heckel.[1] The trial court sentenced Groves to a term of ten to 20 years' incarceration. On appeal, Groves raises suppression, admissibility of evidence, sufficiency, weight, and discretionary aspects of sentencing claims.[2] For the reasons below, we affirm the judgment of sentence.

---

[1] *See* 18 Pa.C.S.A. § 2502(c).

[2] We have reordered Groves' arguments for ease of disposition.

The facts and procedural history are as follows.[3] On July 15, 1991, the victim, Heckel, inexplicably disappeared from Lock Haven, Pennsylvania, and her remains have never been found.

Prior to her disappearance, Heckel worked at Hammermill International Paper Company ("Hammermill"), a manufacturing facility in Lock Haven. She was married to John Heckel, Sr., a non-commissioned officer in the U.S. Army. The Heckels had two young children, Alisha and John.[4] Heckel worked in the Human Resources Department at Hammermill, where she was considered a diligent and well-liked employee.

Groves also worked at Hammermill, where he was an industrial hygienist, and was known as a quiet and conscientious employee. He was married to Katherine Groves, and also had young children, who were friends with the Heckel children.

During the summer of 1991, Heckel and Groves were engaged in a physical, romantic relationship. However, in the middle of July, Heckel wanted to end the relationship with Groves because she began an affair with Dennis Taylor, a high school friend with whom she had recently reconnected. Heckel

---

[3] The trial court provided an extremely detailed recitation of the lengthy trial testimony in its Rule 1925(a) opinion. **See** Trial Court Opinion, 6/11/2019, at 1-45. Our summary is based on the court's opinion, and we refer the parties to the opinion for a complete recitation of the facts.

[4] At the time, Alisha was 13 years old and John was 9 years old.

expressed to Taylor that Groves was extremely resistant to ending the relationship.

On the day of Heckel's disappearance, Heckel told Taylor in a telephone conversation that she was going to go to lunch with Groves so that she could end the relationship with him. She then left the Hammermill plant and never returned. She planned to have dinner with her children and meet Taylor later that evening but she did not appear as intended. "[Heckel] was an extremely devoted mother to her two children and was very close with her extended family so her disappearance on July 15, 1991 caused immediate concerns of foul play." Trial Court Opinion, 6/11/2019, at 3.

On the day in question, John Heckel was attending field exercise training at Fort Drum military base in Jefferson County, New York, approximately 7 ½ to 8 hours from Lock Haven.

The day after Heckel disappeared, former Trooper Frederick Caldwall became involved in the case because Heckel's father filed a missing person's report. Trooper Caldwall learned from others that Groves was having an affair with Heckel. Groves voluntarily went to the police station to speak with the trooper, and was not under arrest at the time. Groves denied being involved with Heckel and stated that he last spoke with her on the morning of July 15th. He told the trooper that July 15th was a normal workday, nothing out of the ordinary occurred, and he arrived home at 5:30 p.m. that evening.

The following day, Trooper Caldwall approached Groves at the Hammermill plant, telling Groves that he believed Groves lied about not having a relationship with Heckel. He then asked Groves to come back to the state police barracks, to which Groves agreed. Groves was advised of his rights, but again denied having an affair. The trooper observed that Groves became defiant and loudly answered "no" to questions concerning the relationship. When Trooper Caldwall asked about July 15th, Groves indicated he had a bad memory and could not remember anything about the day.

Trooper Caldwall then transported Groves back to the plant. Groves consented to a search of his van by police, which occurred later that day. During the search, police found two gym bags between the console area, a box of .25 caliber ammunition, a hunting knife, and duct tape.

> In the back of the van, behind the second row passenger seats, was couch seating. In front of the couch seat and behind the second row of seats was an area of carpet on the sidewall that had been cut in small sections. On the floor below there was what looked like a carpet sample lying on the carpet. The Trooper removed the carpet sample and saw that the carpet underneath that section had been cut out all the way down through the padding to the subfloor.

*Id.*, at 15-16 (citations omitted). The trooper asked Groves about the ammunition. Groves admitted he owned a .25 caliber semi-automatic Colt handgun, but that he had not fired the weapon in ages and it was located in his desk at work because he had brought it in to sell it. When questioned about the carpeting, Groves claimed one his children got tar on it and he had to cut it out.

- 4 -

Trooper Caldwall spoke with a 14-year-old friend of Groves' oldest son, Corey Motter, who observed a reddish brown stain in the area where the carpet had been cut out. Motter often rode in Groves' van in the summer of 1991. He stated he did not remember seeing the replacement carpet pad and there were no pieces cut out when he first saw the stain. Motter thought the stain was possibly deer blood, and Groves' son "told him his dad had just shot a deer and this was the cause of the stain." *Id.*, at 22. In his July 19, 1991 police interview, Motter said he was in the Groves' van on July 12th when he saw the stain. He also told police that he was in the van sometime after July 15th and he noticed the replaced carpet spots.

Former state trooper Corporal Dean Kirkendall assisted in collecting evidence from Groves' van, which was then sent to the crime lab in Harrisburg. Kirkendall "noted the area in the van where the carpet had been cut revealed the actual particle board of the van. Possible blood stains were removed with Q-tips and were sent to the crime lab." *Id.*, at 23. Additionally, there was a possible blood stain located on the driver's side wall by the second set of passenger seats and the rear bench seats, a second possible blood stain found on the area by the wood, and a third possible blood stain found above the ashtray.

Ronald Blosser, Jr., a forensic scientist for the Pennsylvania State Police, authored a report, dated August 14, 1991, which indicated that several

samples taken from the van contained human blood but there was an insufficient amount to determine any blood type.

Trooper Miles Houseknecht recovered a firearm from a closed but unlocked desk drawer in Groves' office at Hammermill. The firearm was a .25 Caliber Colt semi-automatic pistol. The gun was submitted to a qualified ballistics expert, who determined it was functioning, capable of firing, and contained five undischarged cartridges. The gun was capable of holding seven cartridges, six in the magazine and one in the chamber.

Trooper Caldwall used helicopters and cadaver dogs to find Heckel, but the efforts were unsuccessful. Heckel's silver Ford Festiva vehicle was discovered on July 18, 1991 in a parking lot at the Lock Haven Hospital.

While Groves was considered the prime suspect since Heckel's disappearance, the case laid dormant until 2013 when a DNA expert, Sarah Kucherer, who worked as analyst at the Pennsylvania State Police Crime Lab in Greensburg, Pennsylvania, analyzed the blood sample in the case and authored a report. As the court explained, "[w]hen DNA testing started in the early 1990's, a large sample was needed to find a DNA match. However, in the mid-1990's a technique was developed to copy DNA which allowed an analysis to obtain DNA matches from small samples of DNA." *Id.*, at 25. Kucherer was able to generate a DNA profile from the small piece of carpet from the rear driver's side wall near an interior light of the van, which indicated the sample contained Heckel's DNA. The samples taken from the two pieces

of gray carpet from the van's left side in front of the rear bench seat were insufficient to develop a DNA profile.

Michael Hutson, a retired FBI agent, also became involved in the case in 2013 to continue in the effort to find Heckel. He interviewed over 100 witnesses. He also found no evidence of suspicious financial transactions on Heckel's part. Through his investigation, he learned Heckel had been in Groves' van on numerous occasions in the timeframe leading up to her disappearance, including one witness who saw Heckel get into Groves' van on a daily basis for periods of 30 to 45 minutes by way of the side door that led to the middle and back of the van and the rear passenger door during the months of June and July 1991.

Groves was subsequently charged with the homicide on January 29, 2015, after a grand jury indictment.[5] Groves filed two motions to suppress, challenging the legality of the search of his van and his desk located at Hammermill. The trial court denied both motions on June 27, 2016. The matter proceeded to a jury trial, which began on November 19, 2018 and concluded on December 3, 2018.

At trial, in addition to the circumstances discussed above, the Commonwealth presented evidence that John Heckel acknowledged the couple had financial issues which they argued about, he suspected his wife

_____

[5] The matter was prosecuted by the Pennsylvania Attorney General's Office.

was having an affair, and that before he left for training, he thought she was considering leaving him.[6]

Heckel's other paramour, Taylor, testified that on the day in question, he had two phone conversations with Heckel. During the first one, the two discussed meeting later that evening at a local restaurant. The second call took place around 11:30 a.m. Taylor described Heckel as upset and frightened while she conveyed that Groves wanted to go to lunch with her.

Taylor tried to call Heckel back about ten minutes later, but she had already left. He subsequently went on a golf outing with friends, and called Heckel's home before he went to play. However, he was told that she did not come home from work. He called again the next morning, and learned Heckel still had not come home. Taylor then went to state police barracks on July 17th, and spoke with an investigator. He described Heckel as being anxious of Groves during the July 15th phone call.

On cross-examination, Taylor admitted he did not inform the investigator until 2014 about Heckel telling him that Groves wanted to take

_____

[6] In an effort to rule out the husband as the perpetrator, the Commonwealth called Ronald Chubb, a fellow officer in the Army National Guard with John Heckel, who testified that he slept in the same tent with John on July 15th and John never left Fort Drum on that date.

her to lunch and that she was fearful.[7] Taylor denied any responsibility or role in Heckel's death.

The Commonwealth also presented the testimony of several Hammermill employees that were at the plant on the day in question. The employees indicated there was a meeting on the morning of July 15th, and Heckel was in the room pouring coffee. Groves came into the room, slamming the door, then he stormed through the room and went out the other door. One witness, Ken Anderson, later heard a heated argument between Heckel and Groves in a conference room. Another employee, Jean Carter, was walking to the company parking lot around noon that day and observed Heckel ahead of her. Carter also saw Groves, sitting in his van in the parking lot, appearing angry and red-faced, and looking at Heckel.

Carol Smith, who shared an office with Heckel, testified that she thought it was unusual when Heckel did not return from lunch, and out of concern, she watched the window that afternoon until 4 p.m. to see if she could note when Groves returned to the plant but never saw his vehicle or Heckel's car.

_____

[7] In the 2014 interview,

> Taylor told the police that [Heckel] said "he wants to take me to lunch." Also, Mr. Taylor acknowledged that when he testified before the Investigative Grand Jury in Harrisburg in 2014, he testified [Heckel], on July 15, 1991, told him "he wanted to take me out to lunch," without specifically stating [Groves'] name. Mr. Taylor explained he assumed she was referring to [Groves].

Trial Court Opinion, 6/11/2019, at 9 (record citations omitted).

Nevertheless, Smith testified "it was not inconceivable that [Groves] could have parked in a different lot." *Id.*, at 11. Smith saw Groves the next day at work and stated he appeared "uncomfortable with a terrified look on his face." *Id.*

Another employee, Kerry Moore, testified he scheduled a meeting at 2:00 p.m. on July 15th, and that Groves was listed as an attendee but he never showed up.

Additionally, a Hammermill witness, Kristina Akeley, testified that she remembered having difficulty in locating Groves at the plant on the afternoon of July 15th. She stated she needed to speak with him about a problem and he could not be found. Akeley went to Groves' office and even tried to page him but he did not respond.[8] "Several days later she received a telephone call from [Groves]. He said[,] 'They think I did it.' She had no idea what he was referring to[, but Groves] seemed frightened." *Id.*, at 12.

The Commonwealth presented the following testimony from the Hammermill communications manager, Julie Brennan:

> [Brennan] knew both [Heckel] and [Groves]. On July 18, 1991, several days after [Heckel]'s disappearance, she received a note at 8:50 a.m. to call the Defendant, Loyd Groves. The note was marked as urgent. Ms. Brennan called [Groves] at 9:30 a.m. She took written notes of her conversation with [him].
>
> Ms. Brennan then read her written notes of the conversation to the jury.

---

[8] However, in a prior statement to police, Akeley told an investigating trooper that she saw Groves on July 15th at approximately 3:00 p.m.

[Groves] told her the police had questioned him and they searched his van and desk. He called to make sure she remembered talking with him on Monday, July 15th. He told her the police were playing games with him. He told her it was clear he was a suspect in the eyes of the police. He noted they found a gun in his desk and he indicated this did not help the situation. [Groves] indicated he was told not to come back to work until a decision was made concerning his having a gun on company property.

Ms. Brennan asked [Groves] where he went to lunch on July 15th and [Groves] responded that he did not remember. Ms. Brennan testified that [Groves'] claim on July 18th that he didn't remember where he went to lunch on Monday, July 15th was "very upsetting to me."

Ms. Brennan confirmed that some time prior to the phone conversation she was asked by the Human Resources manager to go into [Groves'] office to see if there was a gun in his desk. She confirmed she saw a gun in a drawer in his desk.

Ms. Brennan also confirmed she had a telephone conversation with [Groves] sometime after 1:00 p.m. on July 15, 1991.

*Id.*, at 13 (record citations omitted).

The Commonwealth also presented the testimony of Groves' wife at the time, Katherine.[9] She stated that July 15th was the couples' anniversary and they went out for dinner that night, and she noticed Groves appeared preoccupied. Katherine indicated Groves hunted as a teenager, but not as much when he got older, and he never used the van for that purpose.

---

[9] The couple divorced in February of 2016.

Katherine indicated that earlier that day, Groves came home around lunchtime for approximately 15 minutes, but he did not stay to eat lunch. Rather, his purpose was to change his clothes and put the items he had been wearing in a dirty laundry basket. Katherine stated Groves did his own laundry because he was very particular about his clothes. Katherine's testimony continued as follows:

> [She] recalled that after July 15, 1991, there was some discussion about a pad in the back area of the van. She remembered one of the kids trying to pick up the pad and [Groves] telling him to leave it where it was.
>
> She heard [Groves] say that some oil spilled in this area and this is why the pad had been placed there.
>
> Shortly after Kathy Heckel was reported missing, [Groves] told her that he had been interviewed by the police. He told her that the police had considered him a prime suspect and that he might be arrested.
>
> [Katherine] noted that on July 15, 1991 it was unusual for [Groves] to come home at lunchtime. When they lived closer to town it was not unusual for him to come home for lunch, but when they moved to a more rural area it was too far to drive to come home at lunch. [Katherine] testified that [Groves] was the only driver of the van. She did not find [Groves] to be a very forgetful person.
>
> [Groves] gave his wife a detailed note, … with instructions about caring for the house and equipment if [he] was arrested for [Heckel]'s disappearance.
>
> There was also an occasion where [Groves] obtained a rental car and he left a note for his wife, … telling her that he had to get away for a while and he would be back "tomorrow." This occurred in the latter half of July, 1991.

[Katherine] noted that when [Groves] came home around lunchtime on July 15, 1991, he was wearing khaki pants and a tee shirt. He had already removed his top shirt.

He told her that he had a mess at work. [Katherine] estimated the time he came home at lunchtime on July 15 was about 12:45.

[Katherine] acknowledged that she only told police about [Groves] coming home at lunchtime on July 15, 1991 to change his clothes, on June 16, 2018.

She gave this information to the police as part of a proffer agreement, with the understanding this new information could not be used against her for not reporting this information to the police earlier.

She explained her failure to provide this new information earlier to the police by stating that back in 1991, she was given legal advice not to talk to the police; that [Groves] was a target and it was not wise to talk to the police. In light of this advice, she only answered questions and did not offer any extra information to the police.

When she received a subpoena for trial in 2018 she talked to her personal lawyer that she was concerned about withholding information. The lawyer then worked out an agreement with the Commonwealth for the proffered evidence.

On cross-examination, [Katherine] testified that she obtained a divorce from [Groves] in February of 2016. She continued to live with [him] from 1991 until the divorce.

She noted that [Groves] would typically get dirty from working at Hammermill.

The drive home from Hammermill was approximately fifteen (15) minutes each way.

[Katherine] testified that on July 15, 1991 [Groves] came home for only ten (10) minutes. She didn't note anything unusual about him. [Groves] did seem to be in a rush.

*Id.*, at 30-31 (record citations omitted).

The Commonwealth then introduced the testimony of Michelle Bouchard, who is employed in the Law Enforcement Division of Thomas Reuters Special Services.

> [Bouchard] is familiar with the concept of a digital footprint. This footprint can appear in social media, financial records and property records as some examples. She testified that everyone has a digital footprint depending on how they engage the world. She noted the footprint could be from anything such as a saver card used at a drug store or grocery store, a rewards card, a library card, voting registration, applying for a mortgage or turning on a cell phone. Ms. Bouchard noted that [it is] nearly impossible today to avoid leaving some digital footprint as so much information is now stored online.

> The witness noted that even records made years ago which were stored on paper have been digitized "so people's digital footprints are not only getting newer and more current, they are also getting older and we can track somebody's history further back even before if they weren't using computers."

> …

> Ms. Bouchard searched for a digital footprint for Kathy Heckel.

> The witness testified that what she found was what she would expect for an individual who is no longer alive. There were some minor traces of public records tied to addresses and property she was known to be tied to in the late 80's up to 1991. Since then, there has been no activity anywhere in "any of the over five billion records worth of data" that she has electronic access to.

> …

> The most recent date found for Kathy Heckel was from the late 1980's. There was still a trace of property which had been in her name in 1993 or 1994. [Bouchard] noted this was a process the witness would see and expect when an individual is deceased.

The witness testified that large bank transactions or deposits of money would absolutely leave a digital footprint of their activity.

The track of a digital footprint even can be made when a person has changed his or her name.

The witness found no such data in her search for Kathy Heckel.

*Id.*, at 34-35 (record citations omitted).

Groves did not take the witness stand. His defense consisted of the following: (1) a coworker testified she believed she saw Groves in the Hammermill office on the afternoon of July 15th; (2) another plant employee spoke to Heckel on the morning of the 15th and her behavior seemed fine and nothing out of the ordinary; (3) a witness believed he saw Heckel driving a vehicle a day or two after she was reported missing; (4) after Groves was terminated from his job, he called a coworker and said that he had put the gun in his desk at work to sell to the coworker; (5) a plant employee testified he could not recall the events of July 15th, but he prepared a document on August 23, 1991, at the request of Groves, which reflected the notes he made on July 15th on a desk planner and indicated that he had met with Groves that afternoon;[10] (6) the last time Motter was in the van was on July 12th and that is when he saw the dark stain; (7) Heckel's personnel file from Hammermill,

_____

[10] The witness could not produce the original notes because they had been destroyed in a flood. The witness also first reported this information to the F.B.I. in 2015.

- 15 -

which included a health record that indicated Heckel had a laceration on her left index finger from slicing it with a butter knife on the 6th of 1991 but the exact month was not shown; and (8) several witnesses who found Heckel's purse in a dumpster near the National Guard Armory in August of 1991. *Id.*, at 35-44.[11]

After deliberations, the jury found Groves guilty of third-degree murder. On January 17, 2019, the court sentenced Groves to a term of ten to 20 years' incarceration. Groves did not file any post-sentence motions, but did file this timely appeal.[12]

In his first issue, Groves argues the suppression court abused its discretion by denying his motion to suppress the July 18, 1991 search of his van pursuant to a search warrant. *See* Appellant's Brief, at 26. He specifically asserts:

> Because the … allegations fail to demonstrate any past or prospective criminal conduct by [Groves], the search warrant fails to establish probable cause for a search of [his] van. Rather, the search warrant here establishes mere suspicion thereby rendering the search warrant to be nothing more than an investigative tool.

_____

[11] On rebuttal, John Heckel admitted he threw an old pocketbook of Heckel's in the dumpster near the armory because he considered it to be junk and unimportant. He testified he was not in a good state of mind at the time, none of the cards in the purse were current, and he threw the items away because he knew Heckel was dead. *Id.*, at 44-45.

[12] On March 3, 2019, the trial court ordered Groves to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Groves complied with the court's directive. The court issued a Pa.R.A.P. 1925(a) opinion on June 11, 2019.

*Id.*, at 27.

Our standard of review regarding suppression challenges is as follows:

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the [trial court's] conclusions of law [] are subject to our plenary review.

Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress.

*Commonwealth v. Shreffler*, 201 A.3d 757, 763 (Pa. Super. 2018) (citation omitted).

Moreover, because Groves' argument concerns a search warrant, we are guided by the following:

Article I, Section 8 [of the Pennsylvania Constitution] and the Fourth Amendment [of the United States Constitution] each require that search warrants be supported by probable cause. "The linch-pin that has been developed to determine whether it is appropriate to issue a search warrant is the test of probable cause." *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887, 899 (Pa. 1991) (quoting *Commonwealth v. Miller*, 513 Pa. 118, 518 A.2d 1187, 1191 (Pa. 1986)). "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in

- 17 -

the belief that a search should be conducted." ***Commonwealth v. Thomas***, 448 Pa. 42, 292 A.2d 352, 357 (Pa. 1972).

In ***Illinois v. Gates***, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), the United States Supreme Court established the "totality of the circumstances" test for determining whether a request for a search warrant under the Fourth Amendment is supported by probable cause. In ***Commonwealth v. Gray***, 509 Pa. 476, 503 A.2d 921 (Pa. 1986), this Court adopted the totality of the circumstances test for purposes of making and reviewing probable cause determinations under Article I, Section 8. In describing this test, we stated:

> Pursuant to the "totality of the circumstances" test set forth by the United States Supreme Court in ***Gates***, the task of an issuing authority is simply to make a practical, commonsense decision whether, given all of the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. … It is the duty of a court reviewing an issuing authority's probable cause determination to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a common-sense, non-technical manner.

> * * * *

> [Further,] a reviewing court [is] not to conduct a *de novo* review of the issuing authority's probable cause determination, but [is] simply to determine whether or not there is substantial evidence in the record supporting the decision to issue the warrant.

***Commonwealth v. Torres***, 564 Pa. 86, 764 A.2d 532, 537-38, 540 (Pa. 2001).

As our United States Supreme Court stated: "A grudging or negative attitude by reviewing courts towards warrants … is inconsistent with the Fourth Amendment's strong preference for

searches conducted pursuant to a warrant; courts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner." ***Gates***, ***supra*** at 236 (citation and quotation marks omitted); ***see also United States v. Leon***, 468 U.S. 897, 914, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) ("Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination.").

***Commonwealth v. Jones***, 988 A.2d 649, 655-656 (Pa. 2010) (footnote omitted).[13]

Groves references ***Commonwealth v. Bagley***, 596 A.2d 811 (Pa. Super. 1991), to support his argument that the search warrant at issue was merely an investigative tool. In ***Bagley***, the appellant arrived at a hospital's emergency room, carrying his deceased wife's body. He claimed she had been electrocuted accidentally as a result of an appliance falling into the hot tub in which she had been bathing. ***See id.*** at 813. An emergency room employee overheard Bagley saying that he had torn apart the room where the accident occurred, and was considering setting his home on fire. ***See id.*** He also indicated he did not want the police to be notified of his wife's death. Nevertheless, a nurse contacted the police, informing them that the circumstances surrounding Bagley's wife's death were suspicious, and that she observed a laceration above the wife's one eye and bruises on her body.

---

[13] ***See also*** Pa.R.Crim.P. Rule 206(a)(1-6) (setting forth the required contents of a valid search warrant).

The police conducted an investigation, which included obtaining a search warrant for Bagley's home. The warrant identified "the criminal violation being investigated as 'Suspicious Death' and authorized police to search the Bagley home for and seize '[a]ny items which may be related to the death of [Bagley's wife]." *Id.* The warrant also described the information the police received from the hospital nurse.

The appellant filed a motion to suppress, which the trial court granted, finding the search warrant was defective because "it failed to identify any crime which had been committed and also because it did not particularly describe the property for which the warrant had been issued." *Id.*, at 814. The Commonwealth then appealed.

A panel of this Court concluded the warrant was defective because "it was not issued upon a showing of reasonable probability that a crime had been committed, but, rather, upon nonspecific suspicions surrounding the death of" the appellant's wife. *Id.*, at 815. Moreover, the Court found:

> [T]he warrant stated no crime but suggested only that it had been issued in the investigation of a suspicious death. It authorized the police to seize *anything* that *may* have been related to [the wife's] death. This was done without stating any cause for believing that [the wife's] death had been a criminal homicide. It is readily apparent, therefore, that the primary purpose for the search warrant was not to search for specific evidence of a crime which had been committed, but merely to allow police to conduct a general investigation to determine whether [the wife's] death might have been criminal.

*Id.* (italics in original).

The **Bagley** Court further opined:

The use of a search warrant as a general investigatory tool is prohibited by both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. A search warrant serves to authorize the seizure of identifiable and existing property. It is not available as a general investigatory tool to be used in place of a grand jury. [M]ere suspicions do not constitute probable cause to support a search warrant. A search warrant may not be issued unless the affidavit alleges a preexisting crime.

***Id.***, at 815 (internal quotations, quotation marks, and citations omitted).[14]

Subsequently, in ***Jones***, the Pennsylvania Supreme Court rejected the argument that "a warrant can <u>never</u> be used as an investigative tool." ***Jones***, 988 A.2d at 657 (emphasis in original). The ***Jones*** Court stated that certain case law, including ***Bagley***, "is readily distinguishable and related to instances where the police only have a mere suspicion that a crime has been committed and/or where the police are unable to describe the items to be searched for "as is reasonably possible." ***Id.***, at 657.

In ***Jones***, police were responding to reports of gunfire on a college campus, when they located the victim's dead body lying on the ground. The police searched the body and found a set of keys that suggested he may have been a student at the university. A witness also spoke to the police, stating

---

[14] Moreover, Groves heavily relies on ***Commonwealth v. Bazzle***, 2004 WL 5393631 (Pa.Com.Pl., Montgomery County, 2004), *aff'd*, 872 A.2d 1267 (Pa. Super. 2004) (unpublished memorandum), *appeal denied*, 897 A.2d 450 (Pa. 2006). ***See*** Appellant's Brief, at 30-37. We note that decisions from the courts of common pleas are not binding on the Superior Court. ***See Barren v. Commonwealth***, 74 A.3d 250, 254 n.2 (Pa. Super. 2013) (citation omitted). Based on the case law, we need not rely on ***Bazzle***.

he heard five shots and then saw a tall individual running from the area. The witness provided a description of the alleged perpetrator that was later determined to match that of the appellant. Police were subsequently able to identify the victim based on information provided by university personnel, and they also learned that the victim roomed with the appellant in a dormitory several blocks from the crime scene. The police interviewed Jones, and he stated the victim left the room after receiving a telephone call and never returned. The police then obtained a search warrant of the dormitory room, seeking any evidence providing identification, cellular phone, pagers, drugs, drug paraphernalia, handguns, and bullets. ***Id.***, at 651-652.

In upholding the suppression court's denial of the appellant's motion to suppress, the ***Jones*** Court stated:

> [T]here was no question that a crime had been committed and that the police could, with fair probability, expect to find evidence related to that crime in what was reasonably believed to be the dead victim's dormitory room, including evidence concerning the positive identification of the victim and any persons with whom the victim may have had recent contact or with whom he may have been involved.

***Id.***, at 657.

Turning to the present matter, on July 18, 1991, the police submitted the following affidavit of probable cause, in pertinent part, to support the issuance of a warrant to search Groves' van:

> That on 07/15/91 at approximately 1200 hrs. Katherine Dolan HECKEL ?/N-F-40/DOB 06/25/51 departed the Hammermill Paper within the city of Lock Haven, Clinton Co. The individual never returned to work from her scheduled lunch hour and has

not been seen nor heard from since. Subject's vehicle a Ford [Festiva] bearing Penna YAY518, silver in color, in which she departed has not been found to date. Investigation into the missing person's complainant has revealed that subject HECKEL has had extra marital affairs to include one with Loyd W. Groves, RD 2, box 740 Lock Haven, Penna 17745 dOB 08/03/49 and Dennis TAYLOR. Information from TAYLOR on 07/17/91 was that the subject HECKEL had confided in him on 07/12/91 that she had informed GROVES that she was ending her relationship with him. That GROVES allegedly became angry and did not desire the relationship to end. Interview conducted by Cpl. Frederick CALDWELL. Security Guard Mike EMMET, Hammermill Paper Co. interviewed on 07/17/91 advised that he observed Loyd GROVES departing the Hammermill complex in the city of Lock Haven at 1205 hrs on 07/15/91. GROVES departing in his gray colored van.

…

Loyd GROVES[,] interviewed on 07/17/91 advised of his rights and agreed to speak[,] provided the following information.

He denied ever having any sexual relationship with Katherine Dolan HECKEL.

He stated he was unsure of his whereabouts on or during 07/15/91. He was unable to remember what time he [went] to work at Hammermill Paper Co/ unable to remember anyone with whom he came in contact while working that date/ unable to remember when he had departed for home[.]

…

A [consensual] search of GROVES Chev van bearing … Penna registration plate number BVZ302 was made 07/17/91. The search revealed a[n] athletic bag containing a hunting knife/pair of sneakers// a second athletic bag containing a box of .25 cal ammunition and lying next to that athletic bag was a partial roll of silver duct tape.

GROVES was not able to account any reason why those items [were] in that vehicle. In the rear passenger area of the vehicle a section of carpet, approx[.] 18 x 12 inches was found to have been removed/cut out from the existing carpeted floor. Adjacent to the carpet section on the floor that had been cut out was a second

area along the wall of the vehicle and the carpet cut out in this area also. GROVES response for the two cut out areas of, cut out, carpet was that one of his children had spilled a[n] oil or tar substance on the carpet.

A search of subject GROVE'S office at the Hammermill Paper Co. was made 07/17/91/1639 hrs.

…

Found in the desk, top drawer was a .25 cal. semi auto, Colt, serial number 375531, with five (5) live rounds in the clip. Additionally numerous cards, greeting cards, were found in the desk many signed "Kathie", three unsigned.

At the time of HECKEL's disappearance her husband was out of state and she was the sole caretaker/guardian of her two minor children. That interviews with numerous family members, including husband John HECKEL; mother and father Mr. & Mrs. Clarance DOLAN/ aunt Donna HECKEL/ and close friend Carol STRALEY indicate that HECKEL would not have voluntarily deserted her children/family. That this type of behavior was totally out of context with HECKEL's past behavior.

That the investigation conducted to date indicates that Katherine Dolan HECKEL did not voluntarily leave the area/family but was [forcibly] removed against her will. It is further believed that trace evidence of Katherine Dolan HECKEL's presence and the manner in which she was removed may be found within the aforementioned vehicle. That said vehicle was used in the commission of a crime against Katherine Dolan HECKEL.

Investigation has shown that GROVE's employment at the Hammermill Paper Company allows him contact/control over numerous chemicals, to include acids/[caustic] substances and flammable substances.

Note: Also found in within the GROVES vehicle was a vinyl seat cushion with a red colored stain, possibly blood.

Search Warrant and Affidavit, 7/18/1991, at 1-2.[15] The police sought the following evidence: hairs and fibers, blood splatter, residue of acidic/caustic/flammable materials, fingerprints/ expended .22 caliber and .25 caliber projectiles, and powder residue. **See id.**, at 1.

In denying Groves' suppression motion, the court found the following:

[Groves'] primary argument in support of invalidating the warrant relies on the general proposition that search warrants cannot be employed as a general investigative tool for police to utilize as a means to determine whether a crime has occurred. **Commonwealth v. Bagley**, 596 A.2d 811 (Pa. Super. 1991). His position is that the affidavit must be able to allege a pre-existing crime, and in the present matter Heckel had only been missing for seventy-two hours without the existence of any foul play connected to her disappearance. He thus questions the existence of probable cause to issue a search warrant which cannot be issued merely on suspicion of a crime.

…

The Commonwealth advances several circumstances revealed in the affidavit that support a finding of probable cause to have issued the warrant. It alleges that Heckel and [Groves] had been involved in an extra-marital affair; that Heckel had tried to end the affair over his objections. Further that on the day of Heckel's disappearance, [Groves] was seen leaving their work place five minutes after she had left. A consensual search of his vehicle revealed the presence of ammunition, duct tape, and a cushion stained with a red colored substance which appeared to be blood. Also an earlier warrantless search … produced among other things a loaded gun and some greeting cards signed by a "Kathie." It also cites [Groves'] prior statements denying having a relationship with Heckel and not being able to remember where he was on the day of her disappearance.

None of the matters relied upon by the Commonwealth would establish probable cause standing by themselves. However,

---

[15] **See also** Suppression Court Opinion, 6/27/2016, at 3-4.

when considered as forming the totality of the circumstances leading up to the issuance of the search warrant, they are much more relevant. This is particularly so when [Groves'] statements concerning the matter could reasonably [be] considered as untruthful or at best evasive thus giving rise to more than mere suspicion that he was involved in the disappearance of Heckel. Further, the prior vehicle search with the cut out sections of carpet and the pillow with the red stain on it buttress this conclusion. Accordingly, the Court finds that the Commonwealth has established probable cause for the issuance of the search warrant in question.

On this issue the Court has considered [Groves'] assertion that the warrant was sought merely for investigative purposes without probable cause. There is probably a fine line between mere suspicion of criminal activity and probable cause for believing that such activity has been committed. In this case after considering the previously described circumstances, including [Groves'] own conduct and statements, the Court finds that probable cause was established.

Suppression Court Opinion, 6/27/2016, at 5-6.

In light of the above-stated principles and case law, we conclude the suppression court did not err in denying Grove's motion to suppress. Like **Jones**, **Bagley** is readily distinguishable from the present matter. Here, the warrant did not merely allow the police to conduct a general investigation to determine whether Heckel's disappearance might have been criminal. Rather, the warrant provided that based on the ongoing investigation, Heckel did not voluntarily leave the area or her family, but was forcibly removed against her will. While the warrant did not state a specific crime, like kidnapping or murder, it is obvious that the warrant pointed to specific criminal conduct. In this regard, Groves would like this Court to apply a "hypertechnical" application to the language of the search warrant based on the lack of a

specifically identified crime, which we decline to do so. **Gates**, 462 U.S. at 236. Additionally, unlike **Bagley**, the warrant did not authorize a general seizure of anything that may have been related to Heckel's disappearance. Instead, it listed specific items the police were seeking.

Moreover, the warrant was supported by probable cause. It merits mention in Groves' argument, he omits the fact that he previously consented to a search of the van, which revealed, *inter alia*, a knife, a box of ammunition, a partial roll of duct tape, and replaced carpeting from several rear passenger areas. In addition to this information, the warrant also established: (1) Heckel had been missing for approximately two days; (2) she was in the process of ending her affair with Groves; (3) Groves left in his van five minutes after Heckel left the plant on July 15th; (4) a gun was found in his office desk; (5) Heckel would not have voluntarily went missing; and (6) Groves denied he was having an affair with Heckel and was unsure of his whereabouts on the day in question.

Based on the totality of the circumstances, one can reasonably infer that there was a fair probability that contraband or evidence of a crime would have been found in Groves' van, and consequently, probable cause existed to support the search. Contrary to Groves' argument, the warrant does not amount to a general investigative tool and does not authorize a general search. Accordingly, Groves' argument fails as we discern no error or abuse of discretion by the suppression court in denying him relief on this claim.

Next, Groves argues the trial court abused its discretion by denying his motion to suppress the warrantless search of his desk located at Hammermill. *See* Appellant's Brief, at 51. He states the Pennsylvania State Police called the Hammermill Human Resources Director and requested that he search Groves' work desk on their behalf, because Groves did not consent to such a search. Relying on *United States v. Blok*, 188 F.2d 1019 (D.C. Cir. 1951), Groves alleges:

> [B]ecause the [p]olice requested that the Hammermill Human Resources Director search [Groves'] desk, the search was done on behalf of the [p]olice. Thus, the search was conducted by the government for purposes of constitutional protection and must have been reasonable.
>
> At the time of the search of [Groves'] desk, the [p]olice had no knowledge of any illegal activity by [Groves] nor any knowledge that evidence of illegal activity would be, or was likely to be, found in [Groves'] desk. Furthermore, [Groves] enjoyed exclusive use of his office and work desk and kept many personal items in the desk as demonstrated by the [p]olice finding, not only [Groves'] firearm, but also numerous greeting cards, some signed and some unsigned, and a letter from his wife addressing personal issues.

Appellant's Brief, at 53-54.

Furthermore, Groves argues the Human Resources Director lacked common authority to search his desk on the police's behalf due to the following: (1) Groves held a privacy interest in his desk because "he enjoyed exclusive use and possession of it and maintained many personal items in the desks;" and (2) the director would not routinely go into employees' desks and would only do so for work-related purposes. *Id.*, at 55. Groves also states,

- 28 -

"[A]t the time of the search the police lacked any reasonable basis to suspect that evidence of criminal activity would be located within the desk. Without this as a substantive basis, the search by the Hammermill Human Resources Director, whether common or apparent authority existed, was unreasonable."

*Id.* Groves concludes:

> Even if the [p]olice had a reasonable basis to suspect that a search of [Groves'] work desk would disclose evidence of criminal activity, no exigent circumstances existed to support the reasonableness as a warrantless search of [Groves] was being interviewed by the [p]olice at the time, and for some hours thereafter. Finally, the [p]olice had ample opportunity to request the issuance of a search warrant for [Groves'] desk, but failed to do so.

*Id.*, at 56.

By way of background, the suppression court noted that during the July 17, 1991 interview with Groves, he stated that he had a .25 caliber pistol in his desk at his place of employment, Hammermill. *See* Suppression Court Opinion, 6/27/2016, at 1. The court stated that as a result of this disclosure, Trooper Mendofik contacted the supervisor of human resources at the plant who confirmed that "these areas including desks and lockers were the property of the company and not the empl[o]yees." *Id.* at 2. The supervisor also relayed that the company had a no-firearm policy. The trooper requested permission to search any unsecured area within Groves' control, and the supervisor instructed the plant's communication manager, Brennan, to go to Groves' desk and see if there the gun was there. Brennan indicated that while the company had keys to all the offices and desks, she did not have to use

any since both Groves' office and desk were unlocked. Brennan did not touch the gun, but reported its presence to the supervisor. Subsequently, Houseknecht, a criminal investigator for the state police, arrived at the plant and met with the supervisor who escorted him to Groves' office. Houseknecht then conducted a search of the office and desk.

Initially, we note courts have recognized that "[a]s with the expectation of privacy in one's home, such an expectation in one's place of work is 'based upon societal expectations that have deep roots in the history of the [Fourth] Amendment.'" *O'Connor v. Ortega*, 480 U.S. 709, 716 (1987) (citation omitted).[16] Accordingly, Groves possessed an expectation of privacy in his office.

Moreover, under both the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution, a warrantless search is *per se* unreasonable "unless it falls within a specifically enumerated exception." *Commonwealth v. Wright*, 961 A.2d 119, 137 (Pa. 2008) (citation omitted). One such exception is third-party consent, which is based on common or apparent authority. *Commonwealth v. Perel*, 107 A.3d 185, 192 (Pa. Super. 2014).

> In general, the common authority doctrine permits a third-party possessing common authority over a premise to give valid consent

---

[16] *See also See v. City of Seattle*, 387 U.S. 541, 543 (1967) ("The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property.").

to search against a non-consenting person who shares authority because "it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). The apparent authority doctrine allows a third-party to consent to a search, even if the third-party does not have common authority over a premise, where an officer reasonably believes, based upon the facts then available, that the consenting third-party had the authority to consent. *Illinois v. Rodriguez*, 497 U.S. 177, 188-89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

*Commonwealth v. Basking*, 970 A.2d 1181, 1184 n.1 (Pa. Super. 2009).

In addressing Groves' issue, the suppression court found the following:

[Groves] takes issue with [Trooper] Mendofik's testimony, particularly that he knew about the gun before a subsequent search of [Groves'] van around 5:15 PM. He relies on Corporal Caldwell's testimony that no mention of a gun was made by [Groves] during the interviews on July 17th as well as certain items that [were] not mentioned in either's report. Keeping in mind that the testimony presented related to events some twenty-five years ago, the Court is not surprised that discrepancies in the testimony exist. However, based on Brennan's testimony that [the supervisor] told her to look for a gun in [Groves'] desk, he must have been apprised of this by [Trooper] Mendofik prior to any search of the van. Also Houseknecht's arrival to conduct the search preceded the search of the van. Accordingly, the [c]ourt is inclined to accept the Commonwealth's version of what led up to the search of [Groves'] desk.

The [c]ourt has considered the arguments and briefs of the parties. Based on the facts as the [c]ourt sees them, the Commonwealth's theory is that [the supervisor] had the common authority over the premises which enabled him to validly consent to a warrantless search of [Groves'] office and desk. In this regard the employer had a common control over these items which was manifested by having a key to both the office and desk. More importantly in view of the employer's having a no firearms in the plant policy, once [the supervisor] was apprised of the possibility that [Groves] had such a weapon in his desk, he had a legitimate interest in a search of the area. This was initially accomplished by

- 31 -

having Brennan on behalf of the employer go to [Groves'] office and desk to verify whether a firearm was there. Upon finding the weapon she reported its existence to [the supervisor]. Subsequently, Houseknecht arrived and conducted the warrantless state police search, found the weapons among other items, and confiscated them. The [c]ourt thus accepts the Commonwealth's argument that such a search based on [the supervisor]'s common authority over the premises constitutes an exception to any federal or state constitutional requirement that a search be done only after the issuance of a valid search warrant.

In the alternative if [the supervisor] did not have such common authority, the [c]ourt accepts the Commonwealth's argument that [Trooper] Mendofik had a reasonable belief that [the supervisor] had apparent authority to consent to such a search[.]

Suppression Court Opinion, 6/27/2016, at 2-3.

We agree with the court's conclusion. First, contrary to Groves' assertion that the police had no knowledge of any illegal activity by him nor any knowledge that illicit evidence would be found in his desk, the record supports the court's finding that based on Brennan's statements, her supervisor told her to look for a gun in Groves' desk and as such, he must have been apprised of this fact by Trooper Mendofik prior to any search of the van.

Furthermore, the third-party consent exception to the warrant requirement applies to the present circumstances. With regard to the common authority doctrine, Hammermill had a company policy that prohibited firearms on the premises. Once the supervisor was informed by the trooper that Groves admitted he had a gun in his desk, the supervisor had a legitimate interest in searching the desk in order to enforce the policy. In the alternative, the trooper's actions under the apparent authority doctrine were valid because

based on the facts available to him at the time, he reasonably believed that the supervisor had the authority to consent to the search of the office. Groves' argument does not persuade us otherwise.

Lastly, in **Blok**,[17] which Groves relies on, the police executed a warrantless search of the defendant's government office desk after her supervisor gave permission to do so. The police found evidence of petty larceny, and the defendant challenged the search. The federal district court invalidated the search and drew the following distinction: "No doubt a search of it without her consent would have been reasonable if made by some people in some circumstances. Her official superiors might reasonably have searched the desk for official property needed for official use. But … the search that was made was not an inspection or search by her supervisors." **Blok**, 188 F.2d at 1021. In other words, the constitutionality of the search depended on the status of the person who was searching. **Blok** is not binding on this Court and moreover, it is distinguishable from the present matter wherein Hammermill management requested Brennan to initially search the desk, and the police did not conduct the search of their own volition. Accordingly, Groves' second suppression issue fails.

---

[17] We note "decisions of the federal district courts … are not binding on Pennsylvania courts, even when a federal question is involved." **Kubik v. Route 252, Inc.**, 762 A.2d 1119, 1124 (Pa. Super. 2014).

Third, Groves claims the trial court abused its discretion by admitting statements made by Heckel to Taylor, concerning Groves' discontent with Heckel's intent to end the affair, because such evidence constituted inadmissible hearsay. *See* Appellant's Brief, at 38. Specifically, Groves points to the following testimony by Taylor:

Q[:] … But to draw you to the statements we're focused on, do you recall Kathy Heckel making a statement to you on July 9, 1991, that the relationship with [Groves] was souring, that she wanted to get out of it, that [Groves] did not want the relationship to end, and he had become upset about her intent to end the relationship?

A[:] Yes. That happened on my birthday because we were with each other that day for about eight hours.

Q[:] Please tell us about that.

A[:] Well, she actually started to bring up conversations about Mr. Groves early in July that she had told me about a relationship that she had had with him, but she wanted to end it, and then conversations actually began to escalate. And when we were together on the 9th she basically said I have to end this. It's -- he's becoming a clinging vine, and I want to end it and I don't think he wants to.

Q[:] What was her demeanor?

A[:] At the time it was -- it was -- she was annoyed. She was -- it was like I don't know what to do. She was fearful that what can I do. I mean, she was kind of in a position where I don't know what I'm going to be able to do other than tell him that I don't want to do this any longer.

Q[:] Based upon your conversation with her, she indicated that he was unwilling to accept that?

A[:] Yes.

Q[:] What did she say about that?

A[:] She just said he -- he keeps calling. I don't want to talk to him. And eventually I just reached the point -- I just started to hang up.

…

Q[:] Is it safe to say that you had telephone contact with Ms. Heckel on July 15?

A[:] Yes.

Q[:] Please tell us about that?

A[:] … And it was approximately around 11:30 or so -- 11:30, quarter to 12. The receptionist said you have a phone call. I answered the phone and it was Kathy. And she was very upset, very -- her tone of voice was completely different than early in the morning. She was frightened. And I said what's the matter. And she said he wants me to go to lunch with him. And I said, [Groves]? She said, yes.

N.T., 11/20/2018, at 17-18, 24-25.[18]

Groves states that "because the statements were utilized to establish the victim's state of mind, and not [Groves'], the statements were legally irrelevant and therefore inadmissible." Appellant's Brief, at 38. (footnote omitted). Moreover, he alleges that in accordance with ***Commonwealth v. Thorton***, 431 A.2d 248 (Pa. 1981), and ***Commonwealth v. Moore***, 937 A.2d 1062 (Pa. 2007), "evidence of the victim's fear and the [d]efendant's motive are only relevant to the degree that the hearsay statements are true." Appellant's Brief, at 43. Groves asserts:

---

[18] Groves had a standing objection throughout Taylor's testimony. ***See*** N.T., 11/20/2018, at 5.

More specifically, that [he] was upset with the victim's intent to end the relationship is wholly dependent upon the truth of the four (4) matters asserted[:] 1) that the victim was involved in an extramarital affair with [Groves]; 2) that the victim had the intent to terminate the extramarital affair; 3) that the victim expressed to [Groves] her intent to end the relationship; and 4) that [Groves] was upset at and resistant to this notion. Thus, only when the statement is considered for the truth of the matters asserted does the statement become relevant to [Groves'] motive to kill.

*Id.*

Additionally, Groves claims that in its closing argument, the Commonwealth represented the testimony at issue as if it was admitted for its truth. *See id.*, at 44. Lastly, Groves asserts Heckel's statement of mind is irrelevant because he did not argue self-defense or accident. *See id.*, at 46. Rather, as he states, his defense was that he did not commit any crime against the victim and therefore, it was his state of mind that was at issue. *See id.*

Our "standard of review of a trial court's evidentiary rulings, including rulings on the admission of hearsay … is abuse of discretion." *Commonwealth v. Walter*, 93 A.3d 442, 449 (Pa. 2014). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Hernandez*, 39 A.3d 406, 411 (Pa. Super. 2012) (citation omitted).

Hearsay is "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to

prove the truth of the matter asserted in the statement." Pa.R.E. 801(c).

Hearsay is generally not admissible unless an exception applies. **See** Pa.R.E.

802. "The rationale for the hearsay rule is that hearsay is too untrustworthy

to be considered by the trier of fact. Exceptions have been fashioned to

accommodate certain classes of hearsay that are substantially more

trustworthy than hearsay in general, and thus merit exception to the hearsay

rule." **Commonwealth v. Charlton**, 902 A.2d 554, 559 (Pa. Super. 2006)

(citation and quotation marks omitted).

Pertinent to this appeal, one such exception is the "state of mind"

exception:

> A statement of the declarant's then-existing state of mind (such as motive, intent or plan) or emotional, sensory or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or believe to prove the fact remembered or belief unless it relates to the validity or terms of the declarant's will.

Pa.R.E. 803(3). "Where, however, the declarant's state of mind is not a factor

at issue in the case, the declarant's statement is immaterial and irrelevant to

the prosecution's case." **Commonwealth v. Levanduski**, 907 A.2d 3, 16 (Pa.

Super. 2006).

> "The admissibility of evidence relating to a victim's state of mind has been a subject of difference in this Court's recent decisions." **Commonwealth v. Moore**, 594 Pa. 619, 937 A.2d 1062, 1070-71 (Pa. 2007). In some instances, following [**Commonwealth v. Luster**, 71 A.3d 1029 (Pa. Super. 2013) (*en banc*)], our Courts have held that the state‑of‑mind exception applies to a murder victim's statement. **See Commonwealth v. Parker**, 2014 PA Super 253, 104 A.3d 17, 29 (Pa. Super. 2014) (victim's questions to grandmother were admissible under state of mind exception);

*see also Commonwealth v. Kunkle*, 2013 PA Super 287, 79 A.3d 1173, 1185 (Pa. Super. 2013) (victim's statement that he was scared of defendant and if he died it would be defendant's fault was properly admitted as evidence based on state of mind exception). At other times, our appellate Courts have held that the state-of-mind exception does not apply to a murder victim's statement. *See Commonwealth v. Green*, 2013 PA Super 249, 76 A.3d 575, 582 (Pa. Super. 2013) (victim's statements that she was afraid of defendant and did not want "to go with him" were not admissible under state of mind exception); *see also Moore*, 937 A.2d at 1069 (victim's statement that defendant bullied him was not admissible under state of mind exception); *see also Commonwealth v. Thornton*, 494 Pa. 260, 431 A.2d 248, 251 (Pa. 1981) (victim's statement that he was fearful of defendant was not admissible under the state of mind exception).

*Commonwealth v. Fitzpatrick*, 204 A.3d 527, 532 (Pa. Super. 2019).

Here, the trial court examined a lack of consistency in the courts regarding the admissibility of statements made by a deceased homicide victim to a third party[19] and found the following:

> We believe any such statements are highly relevant and admissible at trial. They tell an important part of the story of this case leading directly to July 15, 1991, the day of the victim's disappearance. We believe such statements come within the purview of Pa.R.E. No. 803(3) as they indicate an existing intent or plan of the victim to end the relationship.
>
> The victim's state of mind in this regard is clearly relevant and probative to this case. Further, this evidence is relevant to [Groves'] potential motive to harm the alleged victim. The statements also show the relationship has reached a state of ill will between the parties.
>
> Specifically, the [c]ourt finds the statements made to Mr. Taylor on July 9, 1991 that the relationship was souring and she wanted to get out of it and that [Groves] did not want the

_____

[19] *See* Trial Court Opinion, 5/17/2018, at 5-12.

relationship to end and he became upset about the victim's intent are admissible.[3]

Mr. Taylor's proposed the testimony about the July 15 telephone contact with the victim, the day of her disappearance, is likewise admissible. He may refer to the upset state of the victim and that [Groves] wanted to go to lunch with her, which has relevance to her plan to meet him for lunch.

…

The victim's description of [Groves] as a "clinging vine" constantly calling her and sending cards is relevant to the victim[']s firm intent that she needed to end the relationship and the developing ill will between the parties.

_____

[3] Likewise, we find Mr. Taylor's statements made to the State Police, Cpl. Mendofik, in a July 28, 1991 interview, page 92, that when she told [Groves] she was ending their relationship, that he said she should not do this and that he would take anything she could give him, that he just wanted a place in her life, are relevant to the declarant[']s intent to end the relationship and to the growing anger, ill will and potential malice [Groves] was entering into. This is also relevant to a possible motive on [Groves'] part.

Trial Court Opinion, 5/17/2018, at 12-13 (citations omitted). The court further noted that at trial, when Taylor took the witness stand, it gave "a comprehensive cautionary jury instruction which instructed the jury how they could consider the testimony of Dennis Taylor as to statements he would testify were made to him by Kathy Heckel. The [c]ourt [had] reviewed this

instruction with all counsel and gave them full opportunity to contribute to the

instruction." Trial Court Opinion, 6/11/2019, at 47.[20]

---

[20] The court's jury instruction is as follows:

The Commonwealth will offer into evidence several statements that they alleged Katherine Heckel made to Dennis Taylor. You may consider Mr. Taylor's testimony as to these statements with this cautionary explanation by the Court.

The statements of Katherine Heckel to Dennis Taylor to the extent that you believe they were made are not offered for the truth of the assertions made in the statements.

I will illustrate what I mean by a statement offered for the truth of the assertion. An example might be an out of court statement made for its truth that an out of court declarant told him he had employment and earned a hundred thousand dollars per year.

If offered to prove the truth of the facts that the out of court speaker was in fact employed and earned a hundred thousand dollars per year, the statements would be inadmissible hearsay as they were made by an out of court party.

The statements offered here are simply being offered for the limited purpose to show the intent of the alleged victim to end a relationship with [Groves]. The statements are also offered by the Commonwealth to show developing ill will, malice, or discord between [Groves] and Ms. Heckel. You may consider these statements to the extent you find that they show an intent to break off the relationship with [Groves]. You may also consider whether the evidence, whether this evidence, if you believe it -- again, that's totally within your province -- would indicate a reason or motive on [Groves'] part to take the life of Ms. Heckel. Like any other testimony or witness, you will need to determine the credibility of this witness and the weight you will give this testimony in your consideration of all of the evidence.

N.T., 11/20/2018, 10-11.

- 40 -

As noted above, the gist of Groves' argument is that it is only when the statements are considered for their truth of the matters asserted do the statements become relevant to his motive to kill. In **Levanduski**, the victim wrote a letter, which described numerous letters he discovered that were written by the appellant, his common law wife. In the appellant's letters, she expressed a plan to get rid of victim so that she could be in a relationship with another man. The victim's letter expressed fear that the appellant may kill him and that she purportedly abused him. A panel of this Court determined the letter was inadmissible hearsay because "[t]he mere existence of the letter itself was not enough to prove [the a]ppellant's relationship with [the other man] or her motive to kill [the victim]. Here, the jurors had to believe the actual text of the letter, that is, the matters asserted in it, to grasp what the letter was offered at trial to prove." **Levanduski**, 907 A.2d at 18.

However, such evidence has not always been scrutinized so narrowly. For example, in **Commonwealth v. Sneeringer**, 668 A.2d 1167 (Pa. Super. 1995), a panel of this Court permitted the introduction of a statement made by the victim, the appellant's deceased girlfriend, that she intended to end her relationship with the appellant. The panel found the statement was admissible under the "state of mind" exception, opining:

> The fact that the victim intended to end her relationship with appellant made it more probable that she did end the relationship, than if she had no such intention. Moreover, if the victim did end her relationship with appellant, then such a factor is probative of appellant's motive. The mere fact that the victim expressed an intent to end her relationship with appellant does not establish

that she did in fact do so. It does, however, allow the jury to infer appellant's motive from such a revelation, and is properly considered in resolving the question of whether appellant killed the victim. As such, the objectionable remarks were both competent and relevant, and they were properly admitted at trial.

*Id.* at 1171-1172.

Pursuant to ***Sneeringer***, it is proper to admit evidence that demonstrates a declarant intending to commit a particular act in future which would allow the jury to infer the appellant's motive from such a disclosure. Here, the testimony at issue were statements made by Heckel to Taylor that she intended to end the relationship with Groves and she believed he did not want to so. The jury could reasonably infer Groves' motive to kill as a result of Heckel's desire to end the relationship.

Likewise, her statements to meet him so that she could break up, which were made so close in time to her disappearance, are permissible. This conclusion is supported by the decision in ***Commonwealth v. Collins***, 703 A.2d 418 (Pa. 1997), in which the Pennsylvania Supreme Court stated:

On several occasions, we have held that a deceased victim's out-of-court statements evincing an intent to meet the defendant shortly before the killing were admissible pursuant to the state of mind exception because such an intent provided circumstantial evidence that the victim did meet with the defendant.

In each case, the victim's intent to meet the defendant was relevant to the case because it permitted the jury to conclude that the defendant had the opportunity to commit the crime in question.

*Id.* at 425. Turning to the present matter, Heckel's remarks provided circumstantial evidence that she did meet with him on the day of her

disappearance. Accordingly, we conclude the statements at issue were admissible under the state-of-mind exception.

Nevertheless, we must determine whether Heckel's state of mind was relevant to an issue in the case. *See Levanduski*, 907 A.2d at 16. In *Commonwealth v. Laich*, 777 A.2d 1057 (Pa. 2001), the Pennsylvania Supreme Court held that statements made by a homicide victim that her appellant-boyfriend threatened to kill her if he ever found her with another man were inadmissible. The Supreme Court noted:

> Pursuant to the state of mind hearsay exception, where a declarant's out-of-court statements demonstrate her state of mind, are made in a natural manner, and are material and relevant, they are admissible pursuant to the exception. Out-of-court declarations that fall within the state of mind hearsay exception are still subject to general evidentiary rules governing competency and relevancy. Accordingly, whatever purpose the statement is offered for, be it to show the declarant's intention, familiarity, or sanity, that purpose must be a "factor in issue," that is, relevant. Evidence is relevant if it logically tends to establish a material fact in the case, if it tends to make a fact at issue more or less probable, or if it supports a reasonable inference or presumption regarding the existence of a material fact.

*Id.* at 1060-1061 (citations omitted).

However, in *Luster*, an *en banc* panel of this Court determined that a statement made by a homicide victim, indicating that she feared the appellant, her paramour, was going to harm her, was relevant because it showed the appellant's ill will and malice toward the victim. *See Luster*, 71 A.3d at 1041. The *Luster* Court distinguished *Laich* as follows:

> We … do not find that *Laich* supports [the a]ppellant's contention that the victim's statements concerning her fear and apprehension

- 43 -

of [the a]ppellant were inadmissible hearsay. In **Laich**, the defendant admitted his guilt, and therefore our Pennsylvania Supreme Court determined that the victim's statements regarding defendant's jealous threats to kill her were "simply not relevant given appellant's defense" of sudden provocation. In contrast, [the a]ppellant has repeatedly denied his guilt, has not claimed any sudden provocation relative to the victim, and has denied acting with malice.

**Id.** at 1042.[21]

Similar to **Luster**, in the present matter, Groves claims that he did not commit any crime against the victim. Accordingly, evidence of Heckel's state of mind was relevant to an issue in the case because it went to Groves' potential motive to harm Heckel.

At the conclusion of his argument, Groves points to **Moore** in support of his argument that during the Commonwealth's closing argument, it improperly represented the testimony at issue as if it was admitted for its truth.[22] We note it is well settled that a "closing argument is not evidence."

---

[21] Likewise, in **Thornton**, a case relied on by Groves, the statement at issue was made by the victim to a police officer that the appellant and his brother "were after" him. **Thornton**, 431 A.2d at 251. Procedurally in the case, the appellant admitted to shooting and killing the victim and therefore, the matter was at the degree of guilt phase. In concluding that the testimony should have been excluded, the Pennsylvania Supreme Court stated: "[T]he victim's state of mind was not a matter in issue in the case. It was appellant's state of mind, not that of the victim, which was material to establish the degree of guilt, if any, on the charge of criminal homicide." **Id.** Here, Groves did not concede guilt and therefore, his degree of guilt was not the only issue. Accordingly, **Thornton** is not controlling.

[22] In **Moore**, the Supreme Court held that out-of-court statements by the victim concerning alleged bullying by the appellant were inadmissible hearsay

*Commonwealth v. Page*, 965 A.2d 1212, 1223 (Pa. Super. 2009) (quotation omitted).

Furthermore, *Moore* is distinguishable from the present matter because no limiting instruction was requested to mitigate the potential for any prejudice effect.[23] Here, on the other hand, the trial court gave the jury a limited instruction on the matter, and explained that the evidence at issue could not be considered for the truth of the matter of asserted, but for the limited deliberation to show: (1) the intent of Heckel to end a relationship with Groves; (2) the developing ill will, malice, or discord between Groves and Heckel; (3) a reason or motive on Groves' part to take the life of Heckel. *See* N.T., 11/20/2018, 10-11. "[W]hen examining the potential for undue prejudice, a cautionary jury instruction may ameliorate the prejudicial effect of the proffered evidence…. Jurors are presumed to follow the trial court's instructions." *Commonwealth v. Hairston*, 84 A.3d 657, 666 (Pa. 2014). We can presume the jurors followed the court's instructions.[24] Therefore, we

---

evidence. To support its conclusion, the Court stated: "[T]he Commonwealth specifically and substantially relied upon their truth at trial, as reflected both in the prosecutor's arguments concerning admissibility, and in her closing remarks ... and it is readily apparent that the state of mind hearsay exception was used as a conduit to support the admission of fact-bound evidence to be used for a substantive purpose." *Moore*, 937 A.2d at 1073 (internal citation omitted).

[23] *Id.*, at 1074.

[24] It merits mention that Groves does not complain about the jury instruction in his appeal.

discern no abuse of discretion regarding the trial court's conclusion that the testimony at issue was admissible. Accordingly, Groves' third issue merits no relief.

In his fourth argument, Groves contends the court abused its discretion by admitting certain statements he made to Gayle Taylor because the evidence was irrelevant, misleading, and the prejudicial effect outweighed the probative value. *See* Appellant's Brief, at 46-47.

By way of background, Gayle Taylor testified that she worked at the Portage County Health Department in Ohio from 1993 to 1996, where Groves was her coworker from a period of time. *See* N.T., 11/27/2018, at 41-42. She recalled that sometime in 1994 or 1995, she had a conversation with Groves about her son after finding controlled substances in the son's dresser. *See id.*, at 42. Groves told her that he worked with troubled boys and on several occasions, he would take them camping in the woods and counsel them about drugs. *See id.*, at 43. Gayle Taylor then testified to the following:

Q[:] What was your other comment [to Groves]?

A[:] Well, if the drugs don't kill [my son], I'm going to.

…

Q[:] What was [Groves'] response to that comment?

A[:] Well, I can show you how to bury a body so it would never be found.

*Id.*, at 43-44.

With respect to these statements, Groves states:

- 46 -

> [T]he Commonwealth introduced [Gayle] Taylor's testimony to bolster its argument that [Groves] killed the victim and hid her body. However, no evidence was presented that [Groves] had any knowledge about concealing, hiding or burying a body so that it would never be found. Moreover, no evidence was presented that [Groves] buried anything, much less the victim's body. The only evidence at trial that [Groves] had any knowledge and/or ability to bury a body was the testimony of [Gayle] Taylor. That the victim's body was never found, in and of itself, does not lead to the conclusion that [Groves] buried the victim's body or had knowledge to do so in a manner that would cause it to never be found.

*Id.*, at 49.

Keeping our standard of review regarding evidentiary rulings in mind, we are guided by the following: "Relevance is the threshold for admissibility of evidence." *Commonwealth v. Tyson*, 119 A.3d 353, 358 (Pa. Super. 2015) (citation omitted). The Pennsylvania Rules of Evidence provide the following test for relevant evidence:

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

Pa.R.E. 401. "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." *Tyson*, 119 A.3d at 358. "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. "Unfair prejudice is

defined as a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." ***Commonwealth v. Jemison***, 98 A.3d 1254, 1262 (Pa. 2014) (citation and internal quotation marks omitted).

In admitting the testimony at issue, the court explained:

> The [c]ourt believes the testimony of [Gayle] Taylor was clearly relevant and that the probative value of the testimony far outweighed any danger of prejudice to [Groves].
>
> The statement [Groves] made to Gayle Taylor that he could show her how to bury a body so it would never be found was made in 1994 or 1995, within a few years of the disappearance of Kathy Heckel.
>
> …
>
> Despite intensive efforts by law enforcement officials in 1991 and even up to the time of trial to find her remains, her bodily remains have never been found. The comment by [Groves] that he could bury a body so it could never be found has important significance to the facts of this case.

Trial Court Opinion, 6/11/2019, at 48.

We agree with the trial court that even though Groves' comment to Gayle Taylor was made several years after the fact, it was highly relevant to the case because Heckel's body has never been located and it relates to the crime with which Groves was charged – third-degree murder. Additionally, the probative value of the statement is not outweighed by unfair prejudice. This testimony does not suggest finding against Groves on an improper basis. It does not impugn Groves' character unless the jury found that Groves had committed the murder. Furthermore, Groves' argument that the statement

was misleading is not persuasive. Accordingly, we conclude the trial court's ruling regarding Gayle Taylor's testimony does not constitute grounds for reversal, and Groves' argument is unavailing.

In his fifth issue, Groves complains there was insufficient evidence to support his third-degree murder conviction. *See* Appellant's Brief, at 56. He alleges the Commonwealth's expert could not state whether Groves had ever fired the firearm that was found in his office desk or whether the firearm was fired at all since 1946. *Id.*, at 59. Groves states "no evidence was presented that victim died as a result of a gunshot wound or that [Groves] used the .25 [caliber] firearm to kill the victim." *Id.* Moreover, he contends the forensic evidence concerning the hunting knife and the roll of duct tape that were found in his van "failed to demonstrate any connection between these items and the victim's disappearance." *Id.*

Groves touches upon the Commonwealth's theory that he murdered Heckel and placed her body in the van, and then her blood dripped onto the carpet, leaving DNA particles, which is why he had to remove certain pieces of the carpet. Groves counters that he presented evidence that provides a direct explanation as to the presence of Heckel's blood in his van: (1) one of the Commonwealth's witnesses placed Heckel in Groves' van on a daily basis leading up to her disappearance, and they engaged in sexual acts in the precise location where the blood was found; and (2) Hammermill's medical records indicated Heckel "cut her index finger on June 6, 1991, while at work

and that the wound 'bled well' and required re-bandaging to stop the bleeding" and therefore, "it is equally as likely that the minute particles of the victim's blood located in [Groves'] van emanated from her cut finger as opposed to a fatal wound inflicted by" Groves. *Id.*, at 61.

Moreover, Groves argues there was no evidence that he was present at the scene "of the victim's demise," and "that the victim ever came into contact with [Groves] or his van after they left the Hammermill [plant]." *Id.*, at 62. He also points to certain witness testimony that indicated "there was nothing unusual or out of the ordinary about [his] appearance, demeanor or behavior" on the afternoon of July 15th. *Id.*, at 63. He states that while certain witnesses may have testified they observed Heckel and Groves engaged in a heated discussion on the morning in question, "no witness testified to hearing the subject matter of this discussion." *Id.* Furthermore, he points to the testimony of one witness who indicated she saw Heckel that morning, and she "appeared calm and that nothing was out of the ordinary." *Id.*, at 64. With respect to these observations, Groves claims they "give rise to the equally reasonable inference that [he] did not murder the victim." *Id.* Groves proposes an alternative version of Heckel's death and asserts that case law has held that "when a party on whom rests the burden of the proof … offers evidence consistent with two opposing propositions, he proves neither." *Id.*, at 66 (quotation and quotation marks omitted). Groves concludes the

Commonwealth did not meet its burden in establishing that he was guilty of third-degree murder.

In reviewing a sufficiency challenge, our standard of review is as follows:

Because a determination of evidentiary sufficiency presents a question of law, our standard of review is de novo and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Palmer*, 192 A.3d 85, 89 (Pa. Super. 2018) (citation omitted), *appeal denied*, 204 A.3d 924 (Pa. 2019). Therefore, we will not disturb the verdict "unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." *Commonwealth v. Bruce*, 916 A.2d 657, 661 (Pa. Super. 2007) (citation omitted).

Third-degree murder is defined as:

All other kinds of murder other than first degree murder or second degree murder. The elements of third-degree murder, as developed by case law, are a killing done with legal malice. Malice exists where there is a particular ill-will, and also where there is a wickedness of disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty. Malice is established where an actor consciously

disregard[s] an unjustified and extremely high risk that his action might cause death or serious bodily harm. Malice may be inferred by considering the totality of the circumstances.

*Commonwealth v. Golphin*, 161 A.3d 1009, 1018 (Pa. Super. 2017) (citations and quotations omitted); *see also* 18 Pa.C.S. § 2502.

In finding there was sufficient evidence to support Groves' third-degree murder conviction, the trial court extensively detailed the facts to support the verdict, *see* Trial Court Opinion, 6/11/2019, at 53-58, which we have summarized as follows: (1) Heckel and Groves were engaged in a sexual relationship which she was adamant about ending and he was determined to maintain; (2) on the morning of Heckel's disappearance, she and Groves got into a significantly loud and heated argument at their work place that was observed by numerous witnesses; (3) before she left the plant for lunch, she called Taylor and expressed her fear of Groves but indicated that she was about to go to lunch with him; (4) prior to leaving the plant, Groves was observed sitting in his van, appearing angry while he looked directly at Heckel; (5) Heckel never returned to work or met up with Taylor that evening as they had planned; (6) Groves was not observed at the plant and could not be reached that afternoon, and one employee indicated Groves looked terrified and uncomfortable the day after Heckel's disappearance; (7) when Brennan, the plant communications manager, spoke to Groves on July 18th, she asked him where he went to lunch on the day in question and he responded that he could not remember which Brennan found to be very upsetting; (8) when

questioned by police two days after Heckel went missing, Groves denied on several occasions that he had an affair with Heckel and claimed that he could not remember where he went to lunch on July 15th; (9) a gun was found in Groves' office desk and .25 caliber ammunition, a hunting knife, and duct tape was found in his van; (10) human blood, found next to the interior light, matched the DNA of Heckel; (11) a large area of carpet on the passenger side of the van had been cut out and replaced, and while Groves explained that one of his children got tar on parts of the carpet, testing of stains found in the van did not reveal tar or deer blood; (12) Motter, the 14-year-old friend of Groves' children, testified that he saw a large reddish brown stain in the same location of the replaced carpet, and estimated that he observed it three days before Heckel's disappearance but the jury could have readily believed he saw the stain on July 15th because he stated that he was in the van on that date due to the Groves' wedding anniversary and Groves had purchased pizza for the boys on that date;[25] (13) Katherine Groves testified her husband came home on the day in question around 12:45 p.m. for approximately ten minutes, which was unusual based on the distance from their home to the plant, and that stated his purpose for being there was to change his clothes; (14) Katherine Groves also testified that Groves seemed preoccupied that night and in late July of 1991, he rented a car and went away for day because

_____

[25] The police obtained a receipt for the purchase of pizza on that date.

he wanted to get away for a while; (15) Groves subsequently told Gayle Taylor that he could bury a body so it could not be found; (16) there was ample evidence to conclude that Heckel was deceased, despite her body never being found, as demonstrated by the fact that she was a devout mother who was raising the children by herself as a consequence of her husband's military service; and (17) expert testimony revealed there was no digital footprint for Heckel in over five billions records of data. The trial court concluded the jury had sufficient evidence to conclude Heckel "was deceased and was a victim of foul play." *Id.*, at 58.

We agree with the trial court's analysis concerning the sufficiency of Groves' third-degree murder conviction. One can reasonably infer that he was angry with her for wanting to end their affair and so he took her life and disposed of the body so it could never be found. As such, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, our review confirms that the Commonwealth presented overwhelming circumstantial evidence from which it was reasonable for the jury to find that Groves killed Heckel with malice on July 15, 1991.

Moreover, much of Groves' argument asks this Court to reweigh the evidence in his favor. We decline to do so. *See Commonwealth v. Lewis*, 45 A.3d 405, 409 (Pa. Super. 2012) (appellant's "argument that his version of the events was more credible than the Commonwealth's version goes to the weight of the evidence, not its sufficiency."). Additionally, the jury heard

all of the evidence Groves points to in support of his innocence. The jury, sitting as the fact-finder, was free to assess each witness's testimony and to believe all, part, or none of the evidence. **See Golphin**, 161 A.3d at 1018.

Here, the jury found the evidence that demonstrated Groves committed a criminal act against Heckel more credible. Accordingly, Groves' sufficiency argument fails to merit relief.

In his penultimate argument, Groves claims the verdict was against the weight of the evidence. **See** Appellant's Brief, at 67-77. He points to various pieces of evidence, including the fact that various witnesses saw the victim on the day in question and they did not observe anything unusual regarding the victim's demeanor. Prior to addressing the substantive argument, we must determine whether he has properly preserved this claim.

It is well-settled law a defendant must raise a claim asserting the verdict is against the weight of the evidence before the trial court, either orally at sentencing or in a written post-sentence motion. **See** Pa.R.Crim.P. 607. "The purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived." **Id.**, *Comment*. Here, Groves did neither.[26] Therefore, he waived any potential

---

[26] It merits mention that Groves admitted he did not raise a weight claim in any post-sentence motion, but presented it for the first time in his concise statement. **See** Appellant's Brief, at 67 n.9; **see also** Trial Court Opinion, 6/11/2019, at 52 n. 3 ("It should be noted that we have not ruled on the weight of the evidence claim previously as [Groves] did not file a [p]ost-

weight of the evidence claim. ***Commonwealth v. Jones***, 191 A.3d 830, 834-835 (Pa. Super. 2018) (challenge to weight of evidence must be raised in timely pre or post-trial motion).

Lastly, Groves challenges the discretionary aspects of his sentence, claiming the court failed to give individualized consideration to him and without any extenuating or mitigating facts available to it, and therefore, his sentence was excessive. He states:

> [A]lthough [Groves] was convicted of third-degree murder, little, if any, evidence was presented to demonstrate the actual means and manner of the victim's demise. Therefore, other than the seriousness of the crime itself, the court had little, if any, information available to it concerning the severity of the acts perpetrated by [him].

Appellant's Brief, at 79.

Groves points to the following evidence: (1) he spoke at the sentencing hearing and expressed his sympathy for Heckel's family but also maintained his innocence; (2) he had no criminal history prior to or after July of 1991; (3) he had no mental health or substance abuse issues; and (4) he has always maintained gainful employment and successfully raised a family of four children. Groves claims the court ignored these factors and the lack of mitigating or aggravating facts regarding the actual criminal acts, and

---

[s]entence motion to the trial court, but rather, filed this direct appeal. This appeal is the first time the issue has been raised.")

erroneously placed significant focus on the severity of the crime itself and the effect on Heckel's family. **Id.**, at 80.

Challenges to the discretionary aspects of sentencing do not guarantee a petitioner's right to our review. **See Commonwealth v. Allen**, 24 A.3d 1058, 1064 (Pa. Super. 2011).

> An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test: (1) whether appellant has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, **see** Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

**Commonwealth v. Swope**, 123 A.3d 333, 337 (Pa. Super. 2015) (citation omitted).[27]

In this case, Groves filed a timely notice of appeal, and his brief included a statement of reasons relied upon for allowance of appeal, as is required by Pa.R.A.P. 2119(f). **See** Appellant's Brief, at 25-26. Nevertheless, he acknowledges that the issue was not properly preserved at sentencing or in a motion to reconsider and modify sentence. **See id.**, at 77 n. 10; **see also**

---

[27] "The determination of what constitutes a substantial question must be evaluated on a case-by-case basis." **Commonwealth v. Prisk**, 13 A.3d 526, 533 (Pa. Super. 2011). "A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." **Id.** (internal citations omitted).

Pa.R.Crim.P. 720. Accordingly, Groves has waived this argument for appellate review purposes. *See Commonwealth v. Bromley*, 862 A.2d 598, 603 (Pa. Super. 2004).

In any event, even if he did properly preserve the issue, there was no abuse of discretion on the part of the trial court in imposing his sentence.[28] First, the court expressly stated that it considered the pre-sentence investigation report. *See* N.T., 1/17/2019, at 4-5. As such, we must "presume that the sentencing [court] was aware of relevant information regarding [Groves'] character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Devers*, 546 A.2d 12, 18 (Pa. 1988). *See also Commonwealth v. Conte*, 198 A.3d 1169, 1177 (Pa. Super. 2018).

Moreover, the trial court explained its rationale for imposing Groves' sentence as follows:

> The maximum penalty for homicide of the third degree was twenty (20) years as of July 15, 1991.
>
> In 1995, the [Pennsylvania] Legislature amended the statute to increase the maximum penalty to forty (40) years.

_____

[28] Groves has presented a claim that would constitute a substantial question. This Court has determined that "an excessive sentence claim – in conjunction with an assertion that the court failed to consider mitigating factors – raises a substantial question." *Commonwealth v. Johnson*, 125 A.3d 822, 826 (Pa. Super. 2015). Nevertheless, it merits mention that this Court has "held on numerous occasions that a claim of inadequate consideration of mitigating factors does not raise a substantial question for our review." *Commonwealth v. Eline*, 940 A.2d 421, 435 (Pa. Super. 2007). In light of the conflicting precedent, we will review the merits of Groves' claim.

The court, although sentencing [Groves] on January 17, 2019, agreed with counsel that the old twenty (20) year maximum penalty applied because the homicide occurred prior to the 1995 amendment.

[Groves] has no prior criminal record and the standard range of the sentencing guidelines was four (4) to ten (10) years. The aggravated range was ten (10) to twenty (20) years. The [offense gravity score] for homicide of the third degree was a ten (10).

The court believes several aggravating factors clearly applied to the sentencing decision.

The court noted the disposal of the victim's body so it has never been found has greatly traumatized the victim's children and her entire family. The family has been deprived of a sense of closure by not having access to Kathy Heckel's body. [Groves] is responsible for this traumatization of the victim's family.

The court also noted that [Groves] took the life of a mother of two young children. Since [Groves'] children socialize with the Heckel children, [Groves] was fully aware, when he took Kathy Heckel's life, that her young children were losing their mother forever. The children, now adults, have been damaged and scarred by this reality. Alisha was age 13 and John age 9 at the time of their mother's disappearance.

Third, the court noted the absolute lack of any real showing of remorse by [Groves] for the victim or her family.

The court at the sentencing hearing reviewed the numerous victim impact letters from many members of Kathy Heckel's family, including her now grown children.

The family has had to live with the investigation from July 15, 1991 to January 2015 when [Groves] was finally arrested.

The family had to endure an eleven (11) day trial and finally, a sentencing hearing on January 17, 2019.

While the court was aware of [Groves'] age, 69, at the time of sentencing and his relatively good employment history and lack of a prior criminal record, these factors were far outweighed by

the heinous crime and circumstances surrounding the death of a vibrant young mother, and the hiding or destruction of her body.

The court believes the circumstances of this case call for the ten to twenty year sentence imposed and the court noted if the events had occurred after the 1995 Sentence Amendment, Defendant would have been facing significantly more time for the commission of this crime. In conclusion, the Court believes the sentence imposed was appropriate and fair under the circumstances of this case.

Trial Court Opinion, 6/11/2019, at 48-50 (some capitalization removed).

Accordingly, we find that the trial court took into account the nature and circumstances of the offense for which Groves was convicted, considered his history and characteristics, specifically noting his lack of showing any remorse, as well as the impact on the victim's family. Because the court took a reasoned approach and considered mitigating factors when sentencing Groves, we would discern no abuse of discretion. Accordingly, if properly preserved, his final argument would fail.

Judgment of sentence affirmed.

President Judge Emeritus Ford Elliott joins the memorandum.

Judge Kunselman joins and files a concurring statement.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>9/24/2020</u>